UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CLARENCE WILLIAMS,

      Plaintiff,

  v.

UNITED AIRLINES, INC.,

      Defendant.

No. C 19-02988 WHA

**ORDER RE EXCLUSION OF EVIDENCE UNDER WIRETAP ACT**

**INTRODUCTION**

In this civil action for race discrimination and retaliation, defendant has moved for summary judgment and to exclude certain opposition evidence purportedly obtained in violation of the Federal Wiretap Act, 18 U.S.C. § 2511. Because defendant itself seeks to use the fact of the eavesdropping and the recording in its defense, the motion to exclude the evidence is **DENIED**. A separate order will address the summary judgment motion.

**STATEMENT**

Captain Clarence Williams, who identifies as African American, has worked as a commercial airline pilot for over twenty years. He worked with defendant United Airlines between 1995 and 1996, then flew for other airlines, including Continental Airlines from 2005 until 2010 when Continental merged into United. Williams remained at United as a pilot. In 2015, Senior Manager of Fleet Standards Jay Cormican promoted Williams to a management role

1   as a Fleet Technical Manager (FTM) for the Boeing 787 fleet.  Cormican supervised Williams
2   throughout his time as an FTM.  Cormican reported directly to Capitan John Weigland.  Williams
3   still works for United (Williams Decl. ¶ 3–6).
4        On September 21, 2016, Williams attended a required flight standards meeting via
5   conference call from Houston.  The telephone meeting also took place with others in person in
6   Colorado.  The record is unclear concerning who else attended (apart from those at the Colorado
7   site).  Williams called in from Houston using a phone provided by United and by dialing a phone
8   number which connected him to a "conference bridge" service.  United had provided him the
9   phone number and conference code with which to join the meeting.  At the termination of that
10  portion of the meeting, however, he heard Weigland, who attended in Colorado, say, "Senior
11  managers, meet me back here in 10 minutes."  Williams was not a senior manager.  He then got
12  up, used the restroom, returned to his desk, and resumed working, all the while leaving his phone
13  line connected to the conference call.  Williams never dialed a new number or entered a different
14  conference code (Williams Exh. 30 at 2, Williams Decl. ¶¶ 9–12, Weigland Dep. 165–175).
15       Williams heard Weigland talk to his senior managers about a group of African American
16  pilots in what Williams felt was a "hostile" tone.  The pilots had previously sued United for race
17  discrimination.  Those pilots had given a press conference earlier that month in Washington, D.C.,
18  and called on the federal government to investigate race discrimination at United against African
19  American employees.  At the telephone meeting, Williams heard Weigland inform his direct
20  reports that they should not comment to media or outside parties about the pilots or their claims.
21  Weigland said that he had been deposed "four or five times" in the prior lawsuits and that his
22  direct reports needed "to not repeat anything or talk about it."  Weigland then said, "They're back
23  at the trough for more."  He added, "We need to put a stop to it forevermore."  Weigland intended
24  his comments for his "direct reports" (presumably the "senior managers"), the only employees
25  invited to participate in this second meeting (Williams Exh. 30 at 2, Williams Decl. ¶¶ 9–12,
26  Weigland Dep. 165–175).
27       Williams recorded part of the conversation on his iphone (operated as a recorder).  No one
28  on the call knew that Williams was listening in and/or recording and no one had given him

1  permission to do either. After several minutes, Williams stopped recording. He knew he was not
2  supposed to be part of the second meeting with senior managers.
3  Approximately one year later, in the fall of 2017, Cormican held several meetings with
4  Williams to inform him that United felt his work fell below par and offered Williams the choice
5  of entering into a Performance Improvement Plan or leaving the management role (to instead fly
6  planes). Weigland attended two of these meetings. Williams declined to choose one of those
7  options and contested United's assessment of his work. Ultimately, in December 2017, Cormican
8  sent Williams a letter in which he "remove[d]" him "from the Fleet Technical Manager role" and
9  returned him to flying on the line (Williams Decl. ¶¶ 22–26, Williams Exh. 9 at 3, Williams Exh.
10 27 at 2, 5).

\*   \*   \*

13 In this suit, Williams accuses United of race discrimination and retaliation in violation of
14 Title VII of the Civil Rights Act of 1964. United moved for summary judgment in October 2020.
15 Among many prongs of argument, the motion includes a defense to damages under the after-
16 acquired evidence doctrine, in which it alleges that United would have terminated Williams for
17 eavesdropping and for recording the fall 2016 meeting. It seeks to bar any damages for alleged
18 decreased earnings after Williams' return to the line. This order addresses United's further
19 motion to prevent Williams from relying on the contents of the telephone conference in 2016
20 because it was allegedly obtained in violation of federal wiretapping laws. This order follows full
21 briefing, oral argument, and supplemental briefing on the admissibility of Weigland's statement.

**ANALYSIS**

The federal wiretapping statute, Title III of the Omnibus Crime Control and Safe Streets
Act of 1968, 18 U.S.C. §§ 2510–2520, provides civil and criminal penalties for

> any person who . . .
>
> (a) intentionally intercepts, endeavors to intercept, or procures any
> other person to intercept or endeavor to intercept, any wire, oral, or
> electronic communication; [or]

3

> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—
> (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication . . . .

18 U.S.C. § 2511.

The Act defines an "intercept[ion]" as an "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Interceptions may arise through in-person eavesdropping, listening in by phone, or recording (either by phone or in person). *See Adams v. Sumner*, 39 F.3d 933, 935 (9th Cir. 1994) (hotel clerk "intercepted" a conversation between guests when she connected the call and remained on the line).

Interception requires minimal *mens rea* under the Act. In 1986, Congress modified the Act to prohibit "intentional" interception, replacing the original "willful interception." Pub. L. No. 99–508, 100 Stat 1848 (1986); *see also United States v. Ross*, 713 F.2d 389, 391 (8th Cir.1983) ("Congress intended 'willfully' to mean more than intentional") (internal citations omitted). Thus, passively but intentionally remaining on the line during a phone call satisfies this requirement. *See, e.g., Anderson v. City of Columbus, Georgia*, 374 F. Supp. 2d 1240 (M.D. Ga. 2005) (mere failure to hang up qualifies as interception under the Act).

Regardless of the type of communication (wire or oral), a private party who "intercept[s] a wire, oral, or electronic communication" does *not* violate the Act if

> such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. §2511(2)(d); *see also United States v. White*, 401 U.S. 745 (1971) (no violation of the Act in cooperator's knowing radio transmission of a conversation between himself and a co-defendant). A party to a communication, however, must actually participate in it. *See Caro v. Weintraub*, 618 F.3d 94 (2d Cir. 2010) (a party is one that participates in the communication); *In*

*re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125 (3d Cir. 2015) (known presence in the communication necessary to qualify as a party). At the very least, others must know of his or her presence. *See Council on American–Islamic Relations Action Network, Inc. v. Gaubatz*, 31 F. Supp. 3d 237, 255 (D.D.C. 2014).

Additional exceptions under the Act cover persons authorized by law to conduct surveillance under the Foreign Intelligence Surveillance Act, persons using judge-authorized wiretaps, law enforcement agents operating in the normal course of business, telecommunications providers intercepting communications in their ordinary course of business, and, finally, companies which (using phones normally furnished to them) intercept calls in the ordinary course of the business. *See* 18 U.S.C. §§ 2511, 2518, 2510(5). This last exception, relevant to our case, has come to be known as the "business-extension exception."

For a communication to be "intercepted" under the Act, its contents must be acquired "through the use of any electronic, mechanical, or other *device*." 18 U.S.C. § 2510(4) (emphasis added). A "device" means

> any device or apparatus which can be used to intercept a *wire, oral, or electronic* communication other than—
>
> (a) any telephone . . . instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire . . . communication service in the ordinary course of its business and being used by the subscriber or user in the *ordinary course of its business* . . . .

18 U.S.C. § 2510(5) (emphasis added).

**1.  18 U.S.C. §§ 2511 AND 2510(1) – (2).**

Williams does not qualify as a party to the second call. None of its participants knew that he was listening. He did not speak. Nor had Williams received prior consent. His participation ended with the first call, yet he without invitation silently stayed on the line. Soon into the second call, he knew he wasn't supposed to be part of it.

Next, although prior to his supplemental briefing Williams had not disputed United's characterization of Weigland's statement as a "wire communication," Williams now asserts that a

1    genuine issue of material fact exists as to whether it was oral or wire, and whether a violation
2    occurred.
3        Section 2510(2) defines an oral communication as one "uttered by a person exhibiting an
4    expectation" of privacy as to their statement.  In contrast, Section 2510(1) defines a wire
5    communication as an "aural transfer" using "facilities for the transmission of communications by
6    the aid of wire," or like technology, "between the point of origin and the point of reception."  It
7    may be possible for a statement, heard over the phone, to remain an "oral" communication if the
8    statement was not intended to be transmitted:  when "intercepted point-to-point telephonic
9    dialogue includes inculpatory statements contained in background discourse, courts have divided
10   on whether such non-telephonic comments made *during* phone calls are 'wire communications.'"
11   *United States v. Borch*, 695 F. Supp. 898, 900 (E.D. Mich. 1988) (emphasis in original); *see also*
12   *Huff v. Spaw*, 794 F.3d 543 (6th Cir. 2015).  In other words, when speakers never intended to
13   converse over the phone, but a telephone call nevertheless transmitted their statements, the
14   communication may be "oral" because the speaker did not purposefully speak to someone at the
15   other end of the line.
16       Williams urges that this case resembles *Huff*.  There, an employer inadvertently pocket-
17   dialed his executive assistant's office phone.  She picked up, realized he had called by mistake,
18   but nevertheless listened and recorded her boss' in-person conversation with his wife.  The couple
19   later sued her under the Act.  The Sixth Circuit appellate decision found (1) the assistant
20   overheard an "oral communication" between the married couple, and (2) no violation of the Act
21   as to her boss because by negligently calling her, he forfeited his reasonable expectation of
22   privacy.  (The assistant did, however, violate the Act with respect to the wife's statements.) *See*
23   *id.* at 553–554.
24       Relying on *Huff*, Williams argues that if all direct reports attended *in person* then
25   Weigland's failure to hang up waived a reasonable expectation of privacy and Williams did not
26   violate the Act.  Counsel for Williams and for United agreed, at oral argument, that the summary
27   judgment record does not state whether or not the senior managers attended in person, by phone,
28   or both (Dkt. 142 at 9:11–13, 10:4–8).

6

1  *Huff* does not advance Williams' position, however. Even if Weigland's direct reports all attended in person and this turned Weigland's comments into an oral communication, our facts do not indicate that he forfeited a reasonable expectation of privacy by failing to hang up the conference line. Under the Act, the reasonable expectation of privacy test borrows from Fourth Amendment doctrine: "Guided by *Katz*, our inquiry is whether the communications . . . were uttered by a person (1) who has a subjective expectation of privacy, and (2) whose expectation was objectively reasonable." *United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978), citing *Katz v. United States*, 389 U.S. 347 (1967). Our court of appeals has found, for example, that an assistant police chief held a reasonable expectation of privacy in his physical office and that his chief of police had bugged it in violation of the Act, notwithstanding the assistant chief often left his door open. *See id.* at 1225.

Weigland did not pocket-dial Williams, or even call him at the outset. Williams had received the conference line phone number and access code, which allowed him to access both the initial and second meetings, with the expectation that he was invited to the first meeting only. Williams heard Weigland say that he would resume meeting with his senior managers after a break (United Exh. C at 163:17–165:1, 165:4–166:3, 168:22–169:13).

Weigland's subjective expectation of privacy was also objectively reasonable. Individuals may reasonably expect that no one is surreptitiously eavesdropping on meetings with limited participants. Weigland's scenario more resembles *McIntyre* than it does *Huff*. Barring an exception, Williams has violated the Act by intercepting Weigland's oral communication, if indeed it was an oral communication.

If, as is more likely, Weigland's communication was a wire communication, its interception violated the Act as well. Weigland's intercepted communication seems to satisfy the definition of a "wire communication" because it traveled, by phone, between states, he used extension phone (a "device"), and he admits that he "intentionally" listened in and recorded the call. Parties agree that an interstate telecommunications provider operated Weigland's and Williams' telephones. Unless some exception applies, Williams' interception of the wire communication violates the Act (United Exh. C at 169:14–22).

Since the business-extension exception to the Act, considered next, also applies equally to "*wire, oral, or electronic* communication," this order need not (and does not) decide whether Weigland's communication qualifies as one or the other to determine whether a violation of the Act occurred. 18 U.S.C. § 2510(5) (emphasis added).

**2.     THE BUSINESS-EXTENSION EXCEPTION.**

The interception by Williams may avoid violating the Act only if it meets a pertinent exception, namely, the business-extension exception. To repeat, it eliminates liability when a company's ordinary course of business involved (1) furnishing the extension phone to the user, and (2) listening in on an intercepted call. *See* 18 U.S.C. § 2510(5). Part (1) has created little controversy; circuits have readily determined whether devices were furnished in the ordinary course of business. Circuits have not, however, applied a uniform test for part (2), intercepting a call within the "ordinary course of business." Our court of appeals has not ruled on the meaning of the phrase. It has discussed the topic, obliquely, in *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1124 (9th Cir. 2020). The decision appeared to concur with one party in the case, who wrote that the law on the business-extension exception in our circuit was "not fully developed." *Ibid.*

Other circuits have considered the issue and adopted at least four different interpretations of the business-extension exception. The most permissive (and favoring Williams) comes from the Eleventh Circuit: where the contents of an intercepted call merely relate to business, the interception satisfies the exception; if they are personal in nature, it does not. *See Watkins v. L.M. Berry & Company*, 704 F.2d 577 (11th Cir. 1983). Of the *Watkins* line of cases, *Epps v. St. Mary's Hospital of Athens, Inc.*, 802 F.2d 412 (11th Cir. 1986), is closest to our case. It addressed a private suit by two emergency medical technicians (EMTs) whose colleague recorded their racist philippic about a supervisor. The EMTs sued their employer and others under the civil penalty provision of the Act. Appellant Epps had been working in the emergency medical services dispatch unit when his fellow EMT, appellant Stone, called him using the hospital's extension telephone. Their colleague overheard Stone refer to a supervisor as "the hospital's nigger" (among other disparaging remarks) from one room away. *Id*. at 415. After listening for

15 minutes to Stone's side of the call, the colleague relieved a dispatcher and used the extension phone system to record the remainder of the Epps-Stone conversation. The decision stated:

> Operating within the framework of *Watkins v. Berry,* we hold that this was not a personal call. It occurred during office hours, between co-employees, over a specialized extension which connected the principal office to a substation, and concerned scurrilous remarks about supervisory employees in their capacities as supervisors. Certainly the potential contamination of a working environment is a matter in which the employer has a legal interest.

*Id.* at 416–17. The opinion does not describe what use was made of the recording and found simply that the intercepted call related to business interests and thus fell within the exception, so it was not in violation of the Act.

*Second*, at least four circuits require that intercepted communications relate to business (not personal) matters *and*, additionally, that the monitoring itself serves a legitimate business purpose. The D.C., Eighth, and Fifth Circuits, and (with a slight variation) Fourth Circuit have all adopted such a test. Now follow the details.

In *Berry v. Funk*, 146 F.3d 1003, 1006 (D.C. Cir. 1998), the D.C. Circuit began with the Eleventh Circuit's requirements that the intercepted communication must relate to business and added another: "[I]f covert monitoring is to take place it must itself 'be justified by a valid business purpose' . . . or, perhaps, at least must be shown to be undertaken normally." *Id*. at 1009, *quoting Sanders v. Robert Bosch Corp*., 38 F.3d 736, 741 (4th Cir. 1994). Berry, the former Acting Assistant Secretary of State for Legislative Affairs sued State Department officials and employees under the Act. The State Department's Operations Center functioned as a switchboard, connecting calls between high-level officials. The Center's officers were instructed not to monitor or record the calls, except upon request. Berry had not requested monitoring. Berry alleged that the officers, who patched several of his calls through to another high-level official, monitored several calls. He also accused them of once broadcasting a conversation throughout the Center. *Berry* rejected the *Epps* view that the business (or not) nature of the call (alone) determines whether an interception falls within the "ordinary course of business." It held instead that the monitoring must further the business' interests or must "at least" occur normally.

*See also Deal v. Spears*, 980 F.2d 1153, 1158 (8th Cir. 1992) (employer taped all in- and out-going calls for six weeks, suspecting employee burglary, but listening to 20 hours of recorded calls without regard to the content "exceeded business interests"); *Briggs v. Am. Air Filter Co.*, 630 F.2d 414, 420 (5th Cir. 1980) (two-part test fulfilled when an employer suspected an employee of disclosing confidential information to "a business competitor" and listened in on a call with that competitor).

The Fourth Circuit made one modification to this test: a valid business interest must justify the interception itself and also its covert nature. *See Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 741 (4th Cir. 1994). Thus, where Bosch surreptitiously monitored calls to detect bomb threats from outside individuals, and an employee sued, no legitimate business interest justified the failure to alert Bosch's employees of the practice.

*Third,* the Second and Sixth Circuits have adopted a three-element test for "ordinary course of business." The Sixth Circuit, in *Adams v. City of Battle Creek*, 250 F.3d 980, 982 (6th Cir. 2001), held that "ordinary course of business," although not defined in the Act, "generally requires that the use be (1) for a legitimate business purpose, (2) routine, and (3) with notice." *See also Arias v. Mut. Cent. Alarm Serv., Inc.*, 202 F.3d 553, 559 (2d Cir. 2000) (finding an exception under the same three-part test for a security business' practice of recording all calls).

*Fourth*, the most restrictive interpretation of "ordinary course of business" comes from the Seventh Circuit, although the interpretation involved the law enforcement exception under 18 U.S.C. § 2010(5)(b). It held that the exception applied *solely* to "situations in which a business or other entity . . . records calls to or from its premises in order to monitor performance by its employees." *Amati v. Woodstock*, 176 F.3d 952, 954 (7th Cir. 1999) (citations omitted).

In sum, only one circuit has adopted a rule that would bless what Williams did. All of the other circuits would not, meaning they would exclude the evidence as a violation of the Act. Since our court of appeals has not ruled on the meaning of the "ordinary course of business," this order will be guided by the weight of authority.

Williams does not offer a business reason for his interception, and this order declines to find one. He used the recording in the following ways: he eventually gave it to counsel as

1   evidence in the earlier discrimination suit and he seeks to use it in his own suit.  He did not, for

2   example, give it to United's human resources department.

3   It seems harsh to exclude the single most dramatic item of evidence favoring plaintiff.  If

4   we were writing on an otherwise clean slate, this order might well follow *Epps* and the Eleventh

5   Circuit to find that Williams did not violate the Act by eavesdropping.  This order might allow

6   testimony by Williams of what he heard (but not the recording).  Two things, however, counsel

7   the other way.  One is the clear weight of authority.  It goes against admissibility. The other is that

8   whatever rule is applied in civil cases must also be applied in criminal cases under the Act.  If, for

9   example, Williams had eavesdropped as he did while operating as an undercover agent for the

10  government, would we allow him to testify to a jury as to what he had heard?

11  Thus, the meaning of "ordinary course of business" does not apply to listening in on a

12  supervisor's meeting with his direct reports when that interception falls outside an established

13  business practice and lacks a valid business purpose.

### 3.   UNITED CANNOT HAVE IT BOTH WAYS.

Williams' violation of the Act would ordinarily require suppression of what he heard.  *See* 25 U.S.C. § 2515.  United, however, relies upon his eavesdropping and recording to contend, under the after-acquired evidence rule, that it would have fired Williams anyway.  This would reduce damages.  In other words, United seeks to use the phone call affirmatively.  By doing so, it has consented to its admission.

At trial, United cannot insist to the jury that the eavesdropping and the recording were enough to warrant termination without giving enough detail to show to the jury that the conduct was so severe as to justify termination.  The nature of what was said in the call will be a question that the jury will want answered.  What if all he heard was harmless gossip?  Williams, in turn, would be prejudiced by allowing United to portray him as a wiretapper without giving him the chance to explain why he continued to listen and why he turned on the recorder.  He did so because he heard racist talk.  It would be most unfair to allow United to truncate this episode.

Section 2518 grants the *aggrieved person* the right to suppress evidence.  Where an aggrieved party itself seeks to use the conduct, he or she waives the Act's protection.  Our court

of appeals has also recognized an exception to Section 2515's exclusionary provision for criminal defendants who open the door on direct examination to impeachment with an intercepted statement. *See United States v. Echavarria-Olarte*, 904 F.2d 1391, 1397 (9th Cir. 1990) (by testifying about the contents of wiretapped evidence in his criminal trial, defendant opened the door to its admission for impeachment purposes); *see also Culbertson v. Culbertson*, 143 F.3d 825, 828 (4th Cir. 1998) (admitting wiretapped evidence in civil case to impeach a witness' affidavit).

Additionally, United has consented to the intercepted statement's admissibility by affirmatively offering it in evidence with the summary judgment motion. *See Ferrara v. Detroit Free Press*, Inc., No. CIV.A.97-CV-71136-DT, 1998 WL 1788159, at *8 (E.D. Mich. May 6, 1998), aff'd, 52 F. App'x 229 (6th Cir. 2002). At summary judgment in that case, that judge declined to hold a suppression hearing on the admissibility of wiretapped evidence, which the defendants sought to admit, because plaintiff stated at oral argument that she might also use the contents of the wiretapped communication to prove her claims at trial. The judge also gave the plaintiff leave to renew the request for suppression before trial. *But cf. United States v. Wuliger*, 981 F.2d 1497, 1506 (6th Cir. 1992) (declining to admit wiretapped evidence for impeachment purposes in civil case); *Forsyth v. Barr*, 19 F.3d 1527, 1541 (5th Cir. 1994) (same).

United has presented the eavesdropping for its after-acquired evidence defense. Because of this, Williams may offer his side of the story, including the recording.

**IT IS SO ORDERED.**

Dated: January 8, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

12